UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re:

Jesse Jacob and
Kelly Jacob,                                    Case No. 18-26186-beh

       Debtors.                              Chapter 7

---

Corey DeWitt,

       Plaintiff,

v.                                              Adversary No. 18-02217-beh

Jesse Jacob and
Kelly Jacob,

       Defendants.

---

**DECISION**

---

      Landlords occasionally incur great expense cleaning up severe refuse and property damage left by tenants. Many landlords have sought reimbursement for such restoration expense from former tenants, asking that those debts be deemed non-dischargeable. In their view, gross uncleanliness and property damage equals willful and malicious injury under 11 U.S.C. § 523(a)(6).[1] Yet, the majority of courts have held that rental tenants' filthy living conditions and property damage do not rise to the level of willful and malicious injury contemplated by Bankruptcy Code drafters.[2]

      In this case, a landlord, Corey DeWitt, obtained a $41,524.00 default judgment in state court against his former tenants. He now seeks to have a portion of that judgment—$18,995.16—declared non-dischargeable in Jesse

---

[1] Unless otherwise noted, all statutory references are to Title 11, United States Code (the "Bankruptcy Code").

[2] See cases discussed, *infra* at Section II.B.2.

and Kelly Jacob's bankruptcy case as a debt arising from willful and malicious injury due to condition, loss, and destruction of the property. The debtors deny they owe any debt, and further deny that it is of a character made non-dischargeable by section 523(a)(6).

For the reasons explained below, the Court concludes that the debtors owe the plaintiff a non-dischargeable debt in the amount of $3,989.51, due to willful and malicious injury under 11 U.S.C. § 523(a)(6).

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Both sides have consented to the entry of final orders and judgment by the Court. AP-ECF Doc. No. 1, ¶ 3; AP-ECF Doc. No. 3, ¶ 3.[3]

The following are the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

## I.  FACTS

The Court held a two-day trial on July 18 and August 12, 2019. The parties submitted written oral argument in late September. Having weighed the credibility of the witnesses and reviewed the evidence, the Court summarizes the relevant facts below.

### A.    The Jacobs' Tenancy – May 2016 through January 2017

In May 2016, Mr. Corey DeWitt bought a renovated, "move-in-ready" home located at 1728 Minnesota Avenue, South Milwaukee, Wisconsin. On the date of purchase, he began living there and allowed three of his former high school friends to move in under an informal month-to-month tenancy. Mr. DeWitt moved into the home with Mr. and Mrs. Jacob, their two young children, their two dogs, and Ms. Kathree Suchocki and her young child.

The Jacobs' sleeping quarters were in the basement, and they had use of the living room, bathroom, and kitchen areas on the first floor. Mr. DeWitt's

---

[3] Citations to the docket in the Bankruptcy Case No. 18-26186 are noted by "ECF Doc. No." Citations to the docket in Adversary Proceeding No. 18-02217 are noted by "AP-ECF Doc. No."

bedroom was on the first floor. Ms. Suchocki rented two small second-floor bedrooms and had use of the first-floor common areas.[4]

Mr. DeWitt's period of dwelling in the home overlapped with the Jacobs' for a little more than three months. He testified that he went to stay at his parents' home at the end of August 2016[5] to take care of their house and the family dog for a long weekend while his parents were away. During that time, the Jacobs advised him that there was a bedbug problem at his Minnesota Avenue home. Because he wanted to resolve the bedbug problem before returning, he continued staying with his parents thereafter.

It is unclear how or when the friendship among the parties deteriorated but deteriorate it did.

Sometime in August 2016, a rainstorm caused the basement to flood. Then, during August and September, Mr. DeWitt attempted to have the home inspected and treated for the bedbugs. The Jacobs denied access to both Mr. DeWitt and any scheduled inspectors. The Jacobs did not explain their conduct in this regard, but rather, countered that Mr. DeWitt failed to maintain the condition of the home. Mr. Jacob asserted that Mr. DeWitt failed to properly address the flooding in the basement, failed to mow the lawn, and failed to clean the gutters.

On November 2, 2016, Mr. DeWitt drove by his Minnesota Avenue home and witnessed Ms. Suchocki and Mrs. Jacob in his bedroom. At trial, Mr. DeWitt provided video footage showing multiple people in the bedroom as viewed from outside and testified that he had given no one permission to use his bedroom. After taking the video, Mr. DeWitt retrieved the deed to the property, which named him as the owner, and requested South Milwaukee police officers to accompany him to the home. With their assistance, Mr.

---

[4] It appears that all tenants had access to the garage, although Mrs. Jacob testified that the pedestrian door to the garage was broken in May 2016 and never secured thereafter.

[5] Mr. Jacob, on the other hand, testified that Mr. DeWitt went to stay at his parents' home in July, not August. The Court does not find that testimony credible, considering a video captures Mr. Jacob saying "[Mr. DeWitt]'s been gone since August," nor is the testimony relevant to the Court's determination on dischargeability. Pl. Ex. 6, Video ACTV0073, at 33:06.

DeWitt gained entry that evening and found the home was filled with clutter and in disarray—which was not the condition he had left it in, in late August 2016.

After witnessing the state of the home overall and his bedroom specifically, he returned on November 6 with his parents and sought entry into the home. Mr. DeWitt testified that his intention in returning on that day was to install a deadbolt lock on his bedroom door to protect his belongings in that room. He videotaped the entire encounter at the property. Initially, Mr. Jacob crouched just inside the door and denied Mr. DeWitt access to the home, at which point Mr. DeWitt again called South Milwaukee police officers to the premises to encourage entry.

Mr. DeWitt continued to videotape after a police presence allowed him to enter the home. On the video footage, the home is again in a state of disarray, with no clean surface in the kitchen or bathroom and refuse scattered about the floors and other surfaces. No structural damage is apparent. The footage shows that the living room windows were covered by fabric nailed to the walls and the bedroom windows were covered in newspaper. At trial, Mr. Jacob testified that they were covered in this fashion because he liked to walk around naked and did not have the financial ability to buy curtains or blinds.

On the video footage, both Mr. and Mrs. Jacob can be seen and heard yelling at Mr. DeWitt. Mrs. Jacob raises a baseball bat multiple times and attempts to deny Mr. DeWitt access to any part of the home except his bedroom. Mr. Jacob paces in and out of the camera frame in some agitation, occasionally holding the baseball bat for Mrs. Jacob, and arguing with Mrs. Jacob.

Mr. DeWitt's father is seen installing a deadbolt lock on Mr. DeWitt's bedroom door while Mr. Jacob is exclaiming that he will "break the door in" and "kick the [expletive] door in" regardless of the lock. Mr. DeWitt tries to retrieve his personal belongings from the bedroom as well as from other areas of the home, but Mr. and Mrs. Jacob repeatedly verbally deny him access to the living room, basement, and upstairs. Both the Jacobs shout that Mr. DeWitt is

not permitted to remove anything from the premises because (in their view) it was no longer Mr. DeWitt's property.[6] The video shows that as Mr. DeWitt is ascending the stairs to the upper bedrooms, Mrs. Jacob screams, "If he touches anything of [Ms. Suchocki's], I want his skull personally bashed in."

After installing the deadbolt lock and surveying the property, Mr. DeWitt left the home, taking none of his personal belongings with him.

## B.    The Milwaukee County Eviction Action – December 2016

On December 6, 2016, Mr. DeWitt filed two eviction actions: one against the Jacobs (Case No. 16-SC-35231) and another against Ms. Suchocki (Case No. 16-SC-35232).[7] On January 4, 2017, the Milwaukee County Circuit Court held a contested eviction hearing in both cases, at which the Court took the testimony of Mr. DeWitt, Mr. Jacob, and Ms. Suchocki. Pl. Ex. 1, AP-ECF Doc. No. 34. There is no indication why Mrs. Jacob did not testify. The court, the Honorable Ellen Brostrom presiding, made a number of factual findings, which include the following:

- I do find Mr. DeWitt very credible but in great reason for that not just the way that he testified but the videos. The videos do not match what the Defense is saying. The house is absolutely unkept. It absolutely is cluttered. Pl. Ex. 1, AP-ECF Doc. No. 34, at 4:7–12.

- I find Mr. Jacobs in particular, to be completely incredible. I find him to be arrogant, aggressive and entitled. *Id.* at 4:13–15.

- I think this case could easily be referred to the district attorney's office for potential criminal charges including trespass, burglary, potential theft, disorderly conduct. The behavior of the defendants in this case is deplorable. *Id.* at 4:16–21.

---

[6] The Jacobs continually asserted that Mr. DeWitt had no right to enter the home or touch any real or personal property because he had "abandoned" the property, *see infra* Section III.B.

[7] The Jacobs submitted the summons and complaints for both evictions on the docket, Def. Ex. 110, AP-ECF Doc. No. 28, at 2 and Def. Ex. 107, AP-ECF Doc. No. 28, at 7, however, they were never moved into evidence at trial. Nonetheless, the Court may take judicial notice of the contents of the state court docket under Federal Rule of Evidence 201 because they are matters of public record available via an online database commonly known as CCAP (Consolidated Court Automation Programs). *In the Matter of Lisse*, 905 F.3d 495, 496 (7th Cir. 2018); *see also Guaranty Bank v. Chubb Corp.*, 538 F.3d 587, 591 (7th Cir. 2008) ("a court is of course entitled to take judicial notice of judicial proceedings"); *United States v. Doyle*, 121 F.3d 1078, 1088 (7th Cir. 1997) (taking judicial notice of district court's docket sheet).

- There is strong evidence that I find credible that Mr. De Witt's bedroom was his exclusive space. And even when he decided he was not going to stay there, it remained his exclusive space. *Id.* at 7:4–7.

- The video of [Mr. DeWitt's] bedroom shows a complete ransack. I found [Mr. DeWitt's] testimony credible when he stated that that was not the state that he left it in. *Id.* at 7:13–16.

- And the testimony of Mr. Jacob that they neatly went through his items, bagged them up in bags, and put them either in the basement or the garage does not match the video footage. *Id.* at 7:17–20.

- In addition, it's clear from the video that Mr. Jacob and Kelly Jacob were highly aggressive and threatening. Disorderly conduct while armed might be a charge for the behavior that I saw on that video by Ms. Kelly Jacob. *Id.* at 7:16–25 to 8:1.

- This case is a travesty. Mr. De Witt's rights have been run over and run roughshod, and they have been — This has been done, as I said, with Mr. Jacob manifesting an arrogant, aggressive, and entitled attitude and behavior. I'm appalled. I'm really appalled at the behavior of the defendants. *Id.* at 8:2–9.

After considering the evidence, the court rendered judgment in favor of Mr. DeWitt for restitution of the premises. *Id.* at 8:10–13. One week later, on January 11, 2017, the Jacobs were physically removed from the property under a writ executed by the Milwaukee County Sheriff's Office. Ms. Suchocki and her child were not present at the January 11 eviction, and there was no indication that she was still living at the home at that time.

Within hours of the Jacobs' eviction, Mr. DeWitt obtained control of the home and took photographs of the condition in which he found his bedroom, the kitchen, other parts of the home, and damaged items. At trial, Mr. DeWitt presented those photos and portions of videos that he took while walking through the home, narrating the condition.

The evidence shows that the home had continued to deteriorate since his November 6 visit. The home and items therein were poorly maintained, in broken condition, and filthy. Trash littered the home in piles, fully covering the floors. Later, Mr. Jacob attributed the state of the home to the sheriffs'

removal of the Jacobs' furniture, but the Court does not fully credit that testimony.

The walls of the home were damaged with holes, drawings in crayon and ash, and scorch or burn marks.

Mr. DeWitt's interior bedroom door frame had a large crack, appearing over twelve inches long. In his bedroom, his bedframe was taken apart, and his mattress and bedding were badly soiled. He found a pair of his eyeglasses broken. His desk, which Mr. DeWitt had placed in the garage after moving into the home in May, was found in pieces with a portion of it burned in a barbecue grill on the patio. The wall of the garage next to where the grill was found was warped from heat damage.

Mr. DeWitt found his personal belongings strewn about the property, some items in trash bags in the garage, and some items in the basement. Mrs. Jacob testified that she had removed Mr. DeWitt's clothing from his bedroom, put it in trash bags, and took the trash bags to the garage. Mr. DeWitt testified that when he found his clothing, the items were wet and bagged with broken glass and razor blades.

Additionally, some of Mr. DeWitt's possessions were missing entirely. He identified his missing items to include items of monetary value, such as a BluRay disc player, as well as priceless sentimental items such as photographs and sports medals. Other noteworthy items missing were his iPod, personal paperwork, watches, sunglasses, and a cell phone.

Mr. DeWitt testified that he and his parents personally spent 400 hours attempting to clean and rehabilitate the property itself. They also hired professional clean-up services for the dog waste littering the yard. Mr. DeWitt and his mother testified that they obtained a number of quotes or bids for repair work, but the work ultimately was never performed.

**C.     The Milwaukee County Civil Action – February 2017**

Sometime in February 2017, after the Jacobs and Ms. Suchocki were evicted from the Minnesota Avenue property, Mr. DeWitt initiated a civil suit

against the tenants to recover damages incurred, Case No. 17-CV-1633. The Court is unaware of the specific allegations that Mr. DeWitt raised in that civil matter, because Mr. DeWitt never offered the state court complaint as an exhibit in this adversary proceeding. In plaintiff's opening statement to this Court, his counsel referred to a state court judgment and argued that a substantial portion of that judgment represented damages intentionally caused by the Jacobs. Through the course of the adversary trial, counsel did not offer the state court judgment into evidence and provided no evidence of specific claims in the matter.

The Court may take judicial notice that the state court docket reflects that the civil case was one for a "Money Judgment," and that the resolution of the case was a July 10, 2017 default judgment entered in favor of Mr. DeWitt against all three defendants in the amount of $41,000.00, with costs and disbursements at $524.00.[8] The state court docket indicates that the complaint was served by publication. The docket does not allocate the damages as between the three state court defendants and former tenants—Ms. Suchocki, Jesse Jacob, and Kelly Jacob—nor does it allocate damages according to any specific legal theories asserted.

## D. Bankruptcy Court Action

Mr. and Mrs. Jacob commenced their main bankruptcy case with a voluntary Chapter 7 petition filed on June 22, 2018. Among the debts listed on the debtors' Schedule E/F was a $42,000.00 debt owed to Corey DeWitt for "other unsecured" and marked as "disputed." ECF Doc. No. 1, at 18. On September 28, 2018, Mr. DeWitt commenced this adversary proceeding against the Jacobs, asking the Court to determine that approximately $15,000 of his judgment against the Jacobs is non-dischargeable pursuant to section 523(a)(6), because it represents debt incurred by willful or malicious injury. AP-ECF Doc. No. 1.

---

[8] Orders entered by a state court in Wisconsin are appropriate subjects of judicial notice under Federal Rule of Evidence 201 because they are matters of public record, *see supra* note 6.

After several preliminary conferences, the Court referred this matter for mediation, but the parties did not achieve a resolution. As a result, the Court held a two-day trial. Mr. DeWitt was represented by counsel; the Jacobs have represented themselves. During the trial, Mr. DeWitt, both his mother and father, Ms. Suchocki, and both Mr. and Mrs. Jacob testified as to the events surrounding the tenancy and eviction.

## E. The Parties' Arguments

Mr. DeWitt asserts that $18,995.16 of the state court judgment should not be dischargeable, under 11 U.S.C. § 523(a)(6). As evidence of his claim for damages, Mr. DeWitt submitted a list of missing, damaged, or broken items that were so mishandled as to require repair or replacement. Pl. Ex. 2, AP-ECF Doc. No. 34-2. He also submitted a report prepared with the help of his mother, Sue DeWitt, which itemized the repair or replacement costs for these items, asserting that all those costs made up the $18,995.16 non-dischargeable debt owed by the Jacobs. Pl. Ex. 3, AP-ECF Doc. No. 34-3. He argues that the Court should apply collateral estoppel to certain findings of the Milwaukee County Circuit Court from the contested eviction hearing, to bolster this Court's conclusion that the Jacobs injured him and his property in a willful and malicious manner. The following reflects the findings that Mr. DeWitt argues should be preclusive:

1. The house is unkept. It is absolutely cluttered.
2. The testimony of the Defendants is incredible.
3. This case could be referred to the District Attorney's office for criminal charges.
4. Mr. DeWitt's bedroom was his exclusive space.
5. The video of the bedroom shows a complete ransack.
6. The testimony of Mr. Jacob that he neatly went through Mr. DeWitt's items does not match the video footage.

AP-ECF Doc. No. 43, at 4.

In response, Mr. and Mrs. Jacob deny that their activities in the home between May 2016 until they were evicted on January 11, 2017 caused any

damage asserted (*i.e.*, they deny any debt), and further deny that any activity was willful or malicious. As part of their affirmative defenses, the Jacobs assert, relying on Wis. Stat. § 846.102(2), that Mr. DeWitt abandoned the home and his personal belongings and that Mr. DeWitt did not maintain the home adequately, as required by Wis. Stat. § 704.07(2).

## II. APPLICABLE LAW

### A.    Non-dischargeability Actions

As with all exceptions to dischargeability, the plaintiff bears the burden to prove that his claim is non-dischargeable by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). To meet that standard of proof, the "trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question." *Am. Grain Trimmers, Inc. v. Office of Workers' Comp. Programs*, 181 F.3d 810, 817 (7th Cir. 1999). The plaintiff's evidence does not have to be perfect; rather, it only must convince the court that it is "more likely than not" that the debt meets the elements of section 523(a)(6). *Marcotte v. Brazos Higher Educ. Serv. Corp. (In re Marcotte)*, 455 B.R. 460, 474 (Bankr. D.S.C. 2011).

Other policy considerations also are factored in when courts are asked to find a debt non-dischargeable. For one, a principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor, *Grogan v. Garner*, 498 U.S. at 286–87, so that exceptions to that purpose are made sparingly, with some deference to the debtor. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002). Juxtaposed is another purpose of the Bankruptcy Code, which is to minimize creditors' losses from defaults. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

### B.    Non-dischargeability under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." A plaintiff must prove three elements to obtain the exception to discharge under 11 U.S.C. § 523(a)(6): "(1) an injury caused by the debtor

(2) willfully and (3) maliciously." *First Weber Grp. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013).

### 1. Injury Caused by the Debtor

Under the plain meaning of section 523(a)(6), it must be the debtor who acts in both a willful and malicious manner to cause an injury to another's property. *O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 830 (Bankr. N.D. Ohio 2000). Courts recognize that where the debtor did not physically damage the person or property, the debtor may remain liable for purposes of non-dischargeability. *Id.* In cases where the damage may have been caused by dogs, children, or friends, however, there still must be a showing that the debtor encouraged the actions. *Id.* at 831 (finding that the debtor-defendants "influenced and encouraged their children and their friends to commit acts of vandalism"). The debtor's encouragement "can range from overt encouragement to simply an omission, if such an omission was calculated by the debtor in a willful and malicious manner to cause injury." *Id.*; *see also Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 723 (Bankr. N.D. Ill. 2002) (finding that, although some damage was physically caused by others, the debtor permitted the damage to occur while he was in control of the apartment).

By negative implication, without evidence of the debtor causing the injury or a showing of encouragement or influence, a creditor cannot satisfy the first element of section 523(a)(6). *See Hynard v. Merkman (In re Merkman)*, 604 B.R. 122, 130 (Bankr. D. Conn. 2019) (finding that another woman living in the rental property shortly after damage was discovered represented a plausible intervening cause of the damage).

### 2. Willfully and Maliciously

For purposes of section 523(a)(6), "'willful' … modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Similarly, the term "malicious" refers to acts

taken "in conscious disregard of one's duties or without just cause or excuse." *In the Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Because a person is not likely to admit outright to actions taken in a willful and malicious manner, courts must infer that the actions rise to this level by examining the circumstances surrounding the injury at issue. *In re Lazzara*, 287 B.R. at 723 (citing *In re Sintobin*, 253 B.R. at 831).

Injury to property in landlord-tenant circumstances has been examined in a fair number of bankruptcy cases. A majority of courts have concluded that failure to maintain a rental property, alone, is not enough to support a claim of non-dischargeability under section 523(a)(6). *In re Merkman*, 604 B.R. at 130 (collecting cases); *Knowles v. McGuckin (In re McGuckin)*, 418 B.R. 251, 256 (Bankr. N.D. Ohio 2009) (requiring the specific intent standard to be evidenced by overt acts or purposefully failing to act in order to produce a desired consequence).

The determining factor separating these cases is "the court's conclusion that the debtors' conduct was negligent, rather than intentional. Debts based on negligence are dischargeable. Debts based on willful and malicious conduct are not." *In re Merkman*, 604 B.R. at 129 (citing *In re Lazzara*, 287 B.R. at 724 (in turn citing *Kawaauhau*, 523 U.S. at 64)). *Compare, e.g.*, *Sparks v. King (In re King)*, 258 B.R. 786, 797 (Bankr. D. Mont. 2001) (holding that leaving personal property and trash in a rental property was not a willful and malicious injury, nor was the fact that the debtor punched holes in the walls with his fist when that act was not done with the purpose of causing harm to the landlord) *and Smith v. Burgos (In Matter of Burgos)*, No. AP 15-1020-WHD, 2015 WL 9435398, at *3 (Bankr. N.D. Ga. Nov. 9, 2015) (finding that on its own, the evidence of extensive damage to the rental home "can be proof of utter recklessness or deplorable apathy, but without an allegation that the Debtors had a motive to cause her injury, acted with intent to injure, or acted with the knowledge that their conduct would inflict injury, the Plaintiff cannot prevail" under the exception provided in section 523(a)(6)) *with In re Sintobin*, 253 B.R.

at 826 (determining that the damages were non-dischargeable under section 523(a)(6) after noting that the debtors failed to discipline their children even after their propensity for vandalism was known, they failed to notify the landlord of damage in contravention of state law, the damages occurred when the relationship between the parties was deteriorating, and the debtors did not show remorse during testimony) *and Selzer v. Alderson (In re Alderson)*, No. A03–4059, 2004 WL 574134, at *3 (Bankr. D. Neb. Feb 11, 2004) (finding a malicious injury when the debtor, *inter alia*, removed fixtures, spray-painted the furnace and other appliances, where the damage appeared to have been done deliberately upon moving out solely to injure the plaintiff).

## III. DISCUSSION

### A.   The Jacobs Owe a Debt.

While Mr. and Mrs. Jacob have offered a myriad of reasons why they should owe no debt at all to Mr. DeWitt, that matter was decided by the Milwaukee County Circuit Court in February 2017, in Case No. 17-CV-1633. The court entered a money judgment for $41,524.00, against both Mr. and Mrs. Jacob, and Ms. Suchocki.  It does not appear that any of them appealed that judgment, so it remains a final judgment.  The *Rooker-Feldman* doctrine bars this Court from questioning the propriety of the state court's determination that the debtors owe a debt to Mr. DeWitt.  *See*, *e.g.*, *In re Brazelton Cedar Rapids Group, L.C.*, 264 B.R. 195, 198–99 (Bankr. N.D. Iowa 2001); *see also H & M Electric, Inc. v. Gee (In re Gee)*, Ch. 7 Case No. 17-12147, Adv. No. 17-75, 2018 WL 2472711, at *2 (Bankr. W.D. Wis. May 8, 2018).

Because this Court is bound to recognize the state court judgment as creating an enforceable obligation owed by the debtors to Mr. DeWitt, the Court cannot sit as an appellate court to review the judgment on some new theory offered by the Jacobs.  The Court can consider only the nature of that debt, that is, whether any portion of the debt is of a kind that the Bankruptcy Code would deem non-dischargeable.

**B.  The Jacobs' Affirmative Defenses**

The Jacobs argue that the home on Minnesota Avenue and all property left therein was abandoned by Mr. DeWitt under state law and therefore the Jacobs had the right to "do with it how they chose."  AP-ECF Doc. No. 44, at 4.

The Jacobs' invocation of Wis. Stat. § 846.102 for abandonment is legally erroneous, however, as that statute "governs only foreclosure actions initiated by mortgagee."  *Bank of New York Mellon v. Carson*, 361 Wis. 2d 23, 33, 859 N.W.2d 422, 426 (Wis. 2015).  This non-dischargeability proceeding is not a foreclosure action, nor was it initiated by a mortgagee.  Moreover, the Jacobs' assertion of abandonment by Mr. DeWitt is not credible.  Mr. DeWitt remained the titled owner of the home.  His personal property remained in the home—he left furniture, clothing, awards, and personal papers in his bedroom, he left his sporting gear in the basement, and other furnishings and appliances belonging to him were placed throughout the house and garage.  He clearly demonstrated ownership when he directed his father to install a deadbolt lock on his bedroom door on November 6.  Even if the Jacobs had any misguided legal confusion about "abandonment" before November 6, which the Court does not find credible, there was no basis at all for such a notion afterward.

Furthermore, even if the Jacobs are attempting to rely on another state statute, Wis. Stat. § 704.05, which instructs landlords on how to dispose of property left by a tenant, they could not prevail on this "abandonment" argument.  First, the Jacobs were not Mr. DeWitt's landlord.  Second, the Jacobs effectively prevented Mr. DeWitt from retrieving his property, and from maintaining it, by threatening him with a baseball bat when he tried to access parts of the premises, and by not allowing him or an exterminator to address the bedbug problem.  *Cf. Georgeson v. Rodriguez (In re Rodriguez)*, Case No. 17-1078207, Adv. No. 17-0049, 2018 WL 671137 (Bankr. W.D. Wis. Jan. 21, 2018) (declining to find a state court judgment non-dischargeable under section 523(a)(6) where debtor afforded plaintiff several opportunities to remove her personal property and furniture from defendant's home, and the former boyfriend was reasonable to think she had abandoned her possessions two

months after she moved out where she had a key to his home and could gain access while he was at work, and so he disposed of items that were taking up space in his home). The Jacobs incredibly try to turn the property rights argument on its head.

Likewise, the Jacobs' invocation of Wis. Stat. § 704.07(2) misses the mark. That statute concerns landlord duties owed to the premises, to "[k]eep in a reasonable state of repair portions of the premises over which the landlord maintains control." While it is true that the Jacobs repeatedly stated that Mr. DeWitt did not maintain certain aspects of the property, such as cutting the lawn, shoveling snow from the walk, or fixing the garage pedestrian door, this aspect of their defense is a freighter passing in the night. It completely ignores the very long list of damaged and missing property alleged by Mr. DeWitt. Whether Mr. DeWitt should be faulted for poor groundskeeping is (or was) for another day. Such deficits, if true, do not mitigate the damages that the Court is asked to view through the section 523(a)(6) lens.

## C. Issue Preclusion

Mr. DeWitt's counsel asked the Court to give preclusive effect to six findings made by the Milwaukee County Circuit Court during the contested eviction hearing. This Court asked both plaintiff and defendant debtors to address issue preclusion in their written closing arguments. Other than simply quoting 11 U.S.C. § 523(a)(6), Mr. DeWitt's counsel provided the Court with no legal authority. AP-ECF Doc. Nos. 43 and 45. As already mentioned, counsel failed to provide the Court with a copy of the underlying complaints in state court, or the actual judgments. The *pro se* defendants cited to unrelated state statutes. AP-ECF Doc. No. 44; *See supra* Section III.B. Mr. DeWitt has left this Court, to some extent, in the dark about the scope of the lower court proceedings.

"Wisconsin law on issue preclusion forecloses relitigation in a subsequent action of an issue of law or fact if two elements are present: (1) whether the issue was actually litigated in a prior action and was necessary

to the judgment, and (2) whether the application of issue preclusion would be fundamentally unfair." *Glass v. Pulvermacher (In re Pulvermacher)*, 567 B.R. 881, 889 (Bankr. W.D. Wis. 2017). In undertaking the "fundamental fairness" analysis, the Court may consider:

> (1) Could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; or (5) are matters of public policy and individual circumstances involved that would render the application of issue preclusion to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

*Cuene v. Peterson (In re Peterson)*, 604 B.R. 751, 764 (Bankr. E.D. Wis. 2019) (quoting *Smith v. Kleynerman (In re Kleynerman)*, No. 18-26659, 2019 WL 1111569, at *4 (Bankr. E.D. Wis. Mar. 8, 2019)).

Not only does this Court lack information about the precise state court claims, but other public policy concerns militate against giving the six findings preclusive effect. First, while Mr. Jacob testified in the proceeding resulting in eviction, Mrs. Jacob did not. Yet it appears that Mr. DeWitt would like at least some of the state court findings to be given effect against her. Moreover, neither Mr. nor Mrs. Jacob appeared to testify in the civil court action resulting in the damages judgment. Service was by publication, an imperfect method, perhaps, for persons recently evicted. Finally, this Court has had the opportunity to view what is likely the same graphic video evidence, and to hear oral testimony from Mr. DeWitt, his parents, and both Mr. and Mrs. Jacob, as well as some testimony from Ms. Suchocki.

Fundamental fairness prevents this Court from substituting findings of the Milwaukee County Circuit Court on unknown claims for its own credibility assessments and evidentiary determinations. Based on two days of testimony

and numerous exhibits, the Court is fully equipped to make its own findings, and it will rely upon that fresh evidence.

Mr. DeWitt's testimony in the instant case was highly credible. His story was corroborated with detailed evidence, including several videos. On the other hand, the Jacobs argue multiple versions of what occurred, some of which directly contradict their own prior statements captured on the videos.

Overall, having weighed the credibility of the witnesses, the Court accepts much of Mr. DeWitt's testimony, although there are some factual allegations outstanding for which he does not have direct knowledge. The Jacobs' testimony is far less credible, not only given the disconnect between their trial testimony and their threatening statements on the video evidence taken in November, but the likely increasing tension between the parties after Mr. DeWitt installed the deadbolt in November, the eviction action filed against them in December, followed by a contentious hearing in early January and removal a week later.

## D. Injury Attributable to the Jacobs' Willful and Malicious Conduct

With the above legal principles in mind, the Court now will determine what portion, if any, of the $18,995.16 in damages claimed by Mr. DeWitt is non-dischargeable. Overall, the debtors may have experienced misfortunes along the way, but their testimony and conduct was not wholly honest. Some of this creditor's losses should be minimized. While the entire list of damages submitted by Mr. DeWitt may represent some form of injury incurred, or anticipated (in the case of repair bids or quotes), for the reasons explained below, Mr. DeWitt has not proven by a preponderance of the evidence that all $18,995.16 of the damages asserted are the result of willful and malicious behavior by the Jacobs.

### 1. Damages for Ruined Property

Inside the home, the door frame to Mr. DeWitt's bedroom bore a long crack, which was not there when, as shown in the November 6 video, Mr. DeWitt's father was installing the deadbolt. Mr. Jacob's testimony at trial, that

the crack had to have come from installing the deadbolt, is not credible. Instead, the more plausible explanation is that Mr. Jacob carried through with his threat to break into the room sometime after the deadbolt was installed. Likewise, Mrs. Jacob, the woman with the bat, made several verbal threats. After all, both debtors said they regarded everything in that house as theirs once Mr. DeWitt began staying at his parents' home. The Court finds the damage to the door frame to be willful and malicious injury caused by the debtors to Mr. DeWitt's property, in the amount of $745.50.

In the garage, Mr. DeWitt found several large garbage bags containing not only his clothing but also razor blades and broken glass. This is not happenstance. Mrs. Jacob testified that she removed the clothing from Mr. DeWitt's bedroom. The Court finds that packaging Mr. DeWitt's clothing in this dangerous manner is willful and malicious. Mr. DeWitt testified that he had to carefully sort through and ultimately dispose of the clothing in the garbage bags because they were heavily soiled and foul-smelling. The Court will assign the amount of $2,047.49 as non-dischargeable based on the calculations of replacement costs provided by Mr. DeWitt.

Next, Mr. DeWitt stored his corner desk in the garage when moving into the home in May 2016. Upon his investigation on January 11, 2017, he found many broken pieces of it in the garage with other burnt remnants of the desk in the barbecue grill just outside of the garage. The flames or heat from burning the desk must have been intense, because several siding panels of the garage near the grill were warped and scorched. Breaking and burning the desk is not an accidental occurrence. It is not done by mere negligence. It is a willful and malicious act, a hostile reaction to a relationship that completely deteriorated. When Mr. DeWitt's father installed a deadbolt lock on the bedroom on November 6, the video footage shows him changing his drill bits on the patio outside the garage. At that time, there is no charred siding on the garage, no charred desk pieces in the barbecue grill. Later, on January 4, the parties had to testify before Judge Brostrom at the contested eviction hearing, and she made her findings, most of which were heavily against Mr. Jacob. The

Jacobs knew they would have to leave the Minnesota Avenue home, but they didn't leave until the sheriffs arrived. Ms. Suchocki had gone some time before then. If things appeared hostile and tense in the November 6 video, it is a safe surmise that tensions did not abate by January 11.

Based on all the evidence, the Court finds that it is more likely than not that one or both of the debtors destroyed the desk and burned part of it in the barbecue grill, shortly before they were evicted. There was great acrimony between the Jacobs and Mr. DeWitt, at least between November 6, 2016 and January 11, 2017. The Court does not find Ms. Suchocki to be a plausible intervening cause in this item of damage, as it is likely she had already left the premises, there is no evidence that she prevented Mr. DeWitt's entry into the home, and there is no evidence she made threats against him. The desk and the warped siding, representing $1,196.52 of damage, will be non-dischargeable under section 523(a)(6).

### 2. Damages for General State of the Home

The house overall was left in an entirely disorderly state when Mr. DeWitt re-entered on January 11, 2017, however, it was similar to the condition he saw when he videotaped on November 6, 2016. The difference is that much of the larger furniture had been removed to the front lawn, amid several months' worth of dog waste. Garbage remained throughout. Marks on the walls included crayon, ash marks, and one scorch mark on the ceiling over the basement stairs. Mr. DeWitt seeks damages for the clean-up and restoration of the house and yard, including cleaning supplies and professional bedbug treatments. Additionally, he itemizes damages representing the replacement costs for items that were so soiled or broken as to require him to throw them out, such as broken kitchenware, soiled blankets and pillows, a broken wall shelf, and bedding items with irreversible cigarette smoke odor. To some extent, the fact that the disarray and disorderly home looked about the same from November to January suggests more that these tenants never learned how to keep house, and less that they willfully tried to injure Mr. DeWitt or his

property in this respect.  In any event, under the *In re Merkman* line of cases, the damage falls on the spectrum between crudeness and gross negligence, but is not a type of willful and malicious injury.

Mr. DeWitt seeks damages for his bedframe, which was taken apart, scratched, and drawn on with marker.  The bedframe was perhaps found in a state of misuse and poor care, but its condition does not show that of malicious injury.

Mr. DeWitt also seeks damages for bedbug inspections and treatment. There was no evidence that the Jacobs willfully or maliciously invited the bedbugs into the home.  Furthermore, Mr. DeWitt did not offer evidence that any damages were exacerbated or aggravated by the Jacobs' refusal to let him access and treat the property.  The bedbug infestation is an unfortunate occurrence but does not reflect a willful and malicious injury.

In this category, the Court sides with the majority of courts, which regard this disorderly condition as a type of negligence, even gross negligence, but falling short of willful and malicious injury.  *In re Merkman*, 604 B.R. at 130.    Therefore, all of the damages representing clean-up costs and replacing negligently broken items are dischargeable.

### 3.    Damages for Missing Items

Mr. DeWitt testified that many items of his personal property were missing, and he itemized their replacement costs.  The items included his BluRay player, his inhaler, and decorative items.  Mr. DeWitt did not establish that it was more likely than not that the Jacobs, and not Ms. Suchocki, were the cause of the missing property.  On one hand, the Jacobs testified that once Mr. DeWitt went to stay at his parents' house, they felt they could treat items in the home as if those items were their own property.  Additionally, Mrs. Jacob testified that she removed the clothing from the drawers in Mr. DeWitt's bedroom and otherwise cleared the room because she intended to use it for her children.  On the other hand, Ms. Suchocki had access to the common areas of the home as well as the bedroom both before and after the deadbolt lock was

installed.  Further, in Mr. DeWitt's November 2 video evidence, both Mrs. Jacob and Ms. Suchocki were in his bedroom, without his consent.  Mr. DeWitt did not catalog the missing items until some time after the eviction date of January 11, 2017.  Considering she had the same access and opportunities as the Jacobs, Ms. Suchocki is a plausible intervening party and there is no evidence that the Jacobs alone took the property, nor that they took it willfully and maliciously.  Moreover, some smaller items could have been inadvertently broken or discarded by either tenants' children.  Therefore, all of the damages representing missing property are dischargeable.

## CONCLUSION

For the reasons set forth above, the Court concludes that Corey DeWitt established that a portion in the amount of $3,989.51 of the state court judgment is a non-dischargeable debt due to willful and malicious injury under 11 U.S.C. § 523(a)(6).

The Court will enter a separate order consistent with this decision.

Dated: February 11, 2020

By the Court:

Beth E. Hanan
United States Bankruptcy Judge